**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MIKE R. HOOVER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 6601 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| UNITED STATES AIRCREW OFFICERS | ) | |
| ASSOCIATION and CATHAY PACIFIC | ) | |
| AIRWAYS LIMITED, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Captain Mike R. Hoover sued his employer, Cathay Pacific Airways Limited, and his union, the United States Aircrew Officers Association ("USAOA") under the Railway Labor Act ("RLA"). Hoover brings a claim against Cathay for breach of the Collective Bargaining Agreement ("CBA") that governs Cathay's relationship with USAOA and a claim against USAOA for breach of the duty of fair representation. Both defendants now move to dismiss the complaint. For the reasons stated here, both motions (Dkt. 33, 36) are granted.

## BACKGROUND

In considering the motions to dismiss, the Court assumes the truth of the complaint's factual allegations, but not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Hoover's briefs opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745

1

n.1 (7th Cir. 2012). The following facts are set forth as favorably to Hoover as those materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

## I.     The Parties

Hoover is a pilot. He began working for Cathay as a First Officer in April 2005. (Dkt. 29 ¶ 27.) Hoover is a Freighter pilot and flies 747 Freighter aircraft. (*Id.* ¶ 30.) He was promoted from First Officer to Captain in December 2009. (*Id.*) His permanent home base, where he starts and finishes his trips, is Chicago, Illinois. (*Id.* ¶¶ 30, 57.)

Cathay is a Hong Kong-based international airline that offers passenger and cargo services to its customers. (*Id.* ¶¶ 12, 21.) It employs pilots in the United States who operate Passenger and Freighter aircraft. (*Id.* ¶ 23.) U.S.-based Passenger pilots fly 777 aircraft and U.S.-based Freighter pilots fly 747 aircraft. (*Id.*) Cathay retired its last 747 Passenger aircraft from its Passenger fleet in October 2016. (*Id.* ¶ 24.)

USAOA is a trade union and is the sole and exclusive bargaining representative for all U.S.-based pilots employed by Cathay. (*Id.* ¶ 36.) USAOA is controlled by its Executive Committee. (*Id.* ¶ 39.) The Executive Committee participates in the deliberations and decisions of the Disciplinary and Grievance Committee, including those relating to grievances. (*Id.*)

## II.     History of Employment, Representation, and Agreements

From April 2005 through December 2015, Hoover was employed by USA Basing Limited, a Cathay subsidiary. (*Id.* ¶¶ 22, 29.) On January 1, 2016, Cathay became the employer of all pilots based in the United States who had previously been employed by USA Basing Limited. (*Id.* ¶ 22.) To secure employment with Cathay, all U.S.-based pilots, including Hoover, had to resign from USA Basing Limited. (*Id.* ¶ 25.) While employed by USA Basing Limited, many U.S.-based pilots joined the Hong Kong Aircrew Officer's Association ("HKAOA"), a Hong Kong-based

trade union.  (*Id.* ¶ 31.)  HKAOA represents the interests of pilots who reside in Hong Kong and work for Cathay and its foreign subsidiaries.  (*Id.* ¶ 32.)

In August 2015, USAOA was certified as the sole and exclusive bargaining representative for U.S.-based pilots employed by Cathay.  (*Id.* ¶ 36.)  In September 2016, USAOA and Cathay entered into their first collective bargaining agreement (the "CBA"), which provides the conditions of service for Cathay's U.S.-based pilots.  (*Id.* ¶¶ 41-42.)  The CBA was entered for the benefit of members of the USAOA, including Hoover.  (*Id.* ¶ 43.)

Schedule 1 of the CBA contains pilot pay scales.  (*Id.* ¶ 47.)  There are three pay scales titled "Unified FO and Passenger Captain Scale," effective on September 1, 2016, 2017, and 2018, respectively.  (Dkt. 29-1 at 78-80.)  They include salary figures grouped by "First Officer," "Senior First Officer," "Captain," and "Senior Captain."  (*Id.*)  Salaries increase based on rank and year. (*Id.*)  There are three additional scales titled "Freighter Salary Scale," effective on the same dates. (*Id.* at 81-83.)  For the Freighter scales, salary figures are listed only for one rank, "Captain," and increase based on year.  (*Id.*)  Section Five of the CBA defines the seniority of Cathay pilots based on the date they joined the organization.  (Dkt. 29 ¶ 48.)

Letter of Understanding 1 ("LOU 1") between Cathay and USAOA incorporates into the CBA a previous agreement known as the Permanent Basings Policy Agreement 2006 ("PBPA 06").  (*Id.* ¶ 53, Dkt. 29-1 at 98.)  PBPA 06 is a policy agreement entered into between USA Basing Limited, Cathay, three other foreign-based Cathay subsidiaries, and HKAOA.  (Dkt. 29 ¶ 55.) PBPA 06 applies to pilots who operate or are eligible to operate Passenger aircraft and provides the process to allocate permanent bases for pilots when a base vacancy is open for bidding on Passenger aircraft.  (*Id.* ¶¶ 57-59.)  Under PBPA 06, new base vacancies are awarded to pilots who bid on them in order of seniority.  (*Id.* ¶ 60.)

III. **The Notice to Crew and Q&A Process**

On December 2, 2016, Cathay issued a Notice to Crew (the "NTC") announcing new permanent base vacancies in Anchorage, Chicago, Los Angeles, Miami, and New York, available to all U.S.-based pilots. (*Id.* ¶ 49.) The NTC stated that all First Officer vacancies would be compensated on the Unified pay scale, and all Captain vacancies would be compensated on the Passenger Captain pay scale. (*Id.* ¶ 51.) It also stated that all vacancies would be for the 747 Freighter aircraft. (*Id.* ¶ 52.)

Cathay held a question and answer session with USAOA and worked with the union to clarify questions raised by U.S.-based pilots about the PBPA 06 and the new base vacancies. (*Id.* ¶¶ 62-63.) Afterward, on December 23, 2016, Cathay released the "Q&A Process." (*Id.*) The Q&A Process provided that the new base vacancies would "be undertaken in accordance with" PBPA 06. (*Id.* ¶ 64.) Like the NTC, the Q&A Process provided that all available First Officer vacancies would be compensated on the Unified pay scale, while all available Captain vacancies would be compensated on the Passenger Captain pay scale. (*Id.*)

The Q&A Process also provided that the 747 Freighter Captains who were awarded one of the new base vacancies would have their 747 Freighter aircraft "treated as" 747 Passenger aircraft for pay purposes—*i.e.*, those Freighter Captains would be moved to the Passenger Captain pay scale, even though they would be flying 747 Freighter aircraft. (*Id.* ¶¶ 65, 67.) Meanwhile, 747 Freighter Captains who were *not* awarded one of the new base vacancies, like Hoover, would continue to fly the same 747 Freighter aircraft as the successful bidders, but they would still be "treated as" 747 Freighter aircraft for pay purposes and would remain on the Freighter Captain pay scale. (*Id.* ¶¶ 66, 68.) For some pilots, the difference in pay between the Freighter Captain and Passenger Captain pay scales is about $5,100 per month or $62,000 per year. (*Id.* ¶ 79.)

Two 747 Freighter Captains with less seniority than Hoover successfully bid on and were awarded new base vacancies in Anchorage. (*Id.* ¶¶ 71-72.) The two junior Captains fly the same aircraft and the same routes as Hoover, they undergo the same training and they have the same flight plans, but they are now paid on the Passenger Captain scale, while Hoover remains on the Freighter Captain pay scale. (*Id.* ¶¶ 73-75.) Hoover did not bid on Anchorage. (*Id.* ¶ 71.)

## IV.    USAOA Grievance Process

USAOA did not object to the NTC or the Q&A Process issued by Cathay. (*Id.* ¶ 69.) On October 12, 2017, Hoover protested the pay change for some 747 Freighter Captains, and "how that affected his seniority for pay purposes," by emailing Cathay's then-Director of Flight Operations. (*Id.* ¶ 78.) He sent a demand letter on January 2, 2018. (*Id.*) Cathay's then-Head of Employee Relations informed Hoover that the Q&A Process was "agreed" with USAOA, that Hoover could have been moved to the Passenger Captain pay scale by bidding on one of the new base vacancies in Anchorage, and directed him to USAOA's grievance procedure in Section 23 of the CBA. (*Id.* ¶ 80.)

On February 26, 2018, Hoover formally asked the USAOA Discipline and Grievance Committee ("the Committee") to file a grievance on his behalf alleging Cathay's breach of the CBA terms covering rates of pay and seniority. (*Id.* ¶ 81.) The CBA provides for a two-stage process to address violations by Cathay: a grievance hearing and a grievance appeal hearing. (*Id.* ¶ 82.) Once the grievance process has been exhausted, a claim can proceed to the System Board of Adjustment (the "Board") for final disposition if Cathay or USAOA wishes to advance it to that stage. (*Id.* ¶ 83.)

Two members of the Committee handled Hoover's request. (*Id.* ¶¶ 84-85.) Both members are 747 Freighter Captains who were awarded new base vacancies and moved from the Freighter

Captain pay scale to the Passenger Captain pay scale. (*Id.* ¶ 86.) Hoover gave the Committee his correspondence with Cathay about his complaint. (*Id.* ¶ 87.) On March 19, 2018, one of the Committee members informed Hoover that the Committee had referred its findings to the "EC" (presumably the Executive Committee) and was waiting for a response. (*Id.* ¶¶ 84, 88.)

On March 28, 2018, the Committee notified Hoover that it was denying his request to file a grievance. (*Id.* ¶ 89.) The Committee's decision cites the Q&A Process issued by Cathay and agreed to by USAOA. (*Id.* ¶ 91.) It also cites Section 8.1 of the Freighter Aircraft Basing Agreement 2000 and then concludes that the Committee was "unable to find any evidence that shows where the company is violating the CBA." (*Id.* ¶ 96; Dkt 29-9.) The decision states that the Committee recommended that USAOA seek legal advice into the possibility of a wage discrimination claim. (*Id.* ¶ 97.)

The decision also states that the Committee met with Captain Seth Goldman, also a 747 Freighter Captain and the Lead of USAOA's Negotiating Committee, who actively participated in the CBA negotiation process with Cathay. (*Id.* ¶¶ 92-93; Dkt. 29-9.) In October 2016, Goldman expressed concern to other pilots about "why there were a freighter scale and passenger scale when there [we]re no passenger planes," and asked if "there was a discrimination case to be had" regarding the "disparate pay scales." (*Id.* ¶ 94.) In January 2017, after the bid awards were released, Goldman stated that it would be "tough" for him to take legal action as USAOA's representative when he "acknowledged the oddity of establishing 'more passenger Captains on a fleet that does only freighter flying,'" and his signature is on the contract containing the Freighter Captain pay scale. (*Id.* ¶ 95.)

Hoover filed this suit on September 27, 2018, five months and 30 days after he received the Committee's decision denying his request to file a grievance. (Dkt. 1).

## DISCUSSION

I.      **Motions to Dismiss Under Rules 12(b)(1) and 12(b)(6)**

In assessing a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing subject matter jurisdiction. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014). When ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court accepts all well-pleaded factual allegations as true and draws reasonable inferences in plaintiff's favor. *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). Where, like here, the Defendant argues that the complaint is formally sufficient but that "there is *in fact* no subject matter jurisdiction . . . the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009).

On a motion to dismiss under Rule 12(b)(6), the Court construes the complaint in the light most favorable to the plaintiff, accepts the factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, a plaintiff's claim need only be plausible, not probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). Evaluating whether a plaintiff's claim is sufficiently plausible to survive a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

## II.    Count I Against USAOA – Breach of the Duty of Fair Representation

Hoover alleges that USAOA breached its duty of fair representation by failing to file a grievance against Cathay on his behalf (Dkt. 29 ¶¶ 106, 115-16), by failing to object to the NTC and Q&A Process issued by Cathay (*Id.* ¶¶ 107, 111), by failing to submit the Q&A Process to members for ratification (*Id.* ¶ 112), and by failing to accurately disclose the effects the Q&A Process would have on members (*Id.* ¶¶ 109, 118).

USAOA moves to dismiss Hoover's claim under Rule 12(b)(6), arguing that it is time-barred and that the complaint fails to state a claim for relief. USAOA prevails on both grounds.

### a.    Statute of Limitations

The parties do not dispute that the limitations period applicable to Hoover's RLA fair-representation claim is six months from the alleged violation. But they dispute what the claim consists of, when the statute of limitations began to run, and whether tolling applies based on Hoover's pursuit of internal union grievance procedures.

The six-month limitations period under the RLA, which courts draw from the corresponding statute of limitations in Section 10(b) of the National Labor Relations Act, "generally begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged [breach of duty]." *Dozier v. Trans World Airlines, Inc.*, 760 F.2d 849, 851 (7th Cir. 1985) (per curiam); *see also Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir 1999); *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1283 (7th Cir. 1985). When a fair-representation claim is based on the union's entering into

a particular collective bargaining agreement, the claim accrues "when the contract is signed." *United Indep.*, 756 F.2d at 1273.

USAOA argues that Hoover has actually alleged two separate fair-representation claims with different accrual dates for statute of limitations purposes. According to USAOA, Hoover's first claim is based on USAOA's failure to object to the NTC and Q&A Process issued by Cathay, and his second claim is based on USAOA's decision not to file a grievance against Cathay on his behalf. USAOA contends that the statute of limitations on the first claim began running when Cathay released the Q&A Process on December 23, 2016 and has since expired. USAOA concedes that Hoover's second claim is not time-barred, because the limitations period did not start running until March 28, 2018, when USAOA informed Hoover that it decided not to file a grievance, and Hoover filed suit within six months of that date. (Dkt. 44 at 3-5.) Hoover, in turn, argues that he brings a single claim based on a "continuum of events" that began when USAOA failed to object to the Q&A Process and culminated when USAOA declined his request to file a grievance. According to Hoover, his claim did not accrue (or, perhaps alternatively, the statute of limitations was tolled) until USAOA declined his request on March 28, 2018, making his entire claim timely. (Dkt. 43 at 8-9.)

USAOA is correct that Hoover asserts two different fair-representation claims. One claim involves USAOA's conduct in 2016 related to Cathay's issuance of the NTC and Q&A Process and is not related to the grievance process. *See* Dkt. 29 ¶¶ 107, 109, 111-12, 118 (alleging that USAOA acted arbitrarily, discriminatorily, and in bad faith by failing to object to the NTC and Q&A Process, denying USAOA members the right to ratify the Q&A Process, and misleading Hoover and USAOA members about its effects). The other claim is related to the grievance process. *See id.* ¶¶ 106, 115-16 (alleging that USAOA acted arbitrarily, deceitfully, and in bad faith

by failing to file a grievance on Hoover's behalf).  Hoover's two fair-representation claims should be treated differently for statute of limitations purposes because they accrued at different times. *See, e.g.*, *Rios-O'Donnell v. American Airlines, Inc.*, 837 F. Supp. 2d 868, 873-74 (N.D. Ill. 2011) (considering non-grievance and grievance-related fair representation claims separately for statute of limitations purposes).  USAOA is also correct to concede that the second, grievance-related claim is timely, because the limitations period began running when USAOA informed Hoover of its final decision not to file a grievance and Hoover filed this suit within six months of that date. *See Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 922 (7th Cir. 1991) (six-month statute of limitations period begins running when "a final decision on a plaintiff's grievance has been made").

That leaves the first claim, based on USAOA's conduct related to the issuance of the NTC and Q&A Process.  USAOA characterizes Hoover's claim as being solely based on USAOA's failure to object.  (*See* Dkt. 35 at 8; Dkt. 44 at 3-5.)  Hoover's allegations are actually broader than USAOA contends.  He claims that USAOA also breached its duty of fair representation by failing to submit the Q&A Process to members for ratification (Dkt. 29 ¶ 112) and by failing to accurately disclose the effects the Q&A Process would have on members. (*Id.* ¶¶ 109, 118).  But for purposes of the statute of limitations analysis, all of USAOA's conduct related to the NTC and Q&A Process accrued at the same time—when the Q&A Process was released.

Hoover's allegations make clear that he was aware of the acts constituting USAOA's alleged breach—namely, its failure to object to the NTC and Q&A Process, to submit the Q&A Process for ratification, and to disclose its effects on USAOA members—in December 2016.  The NTC was issued on December 2, 2016 and the Q&A Process was issued on December 23, 2016. (Dkt. 29 ¶¶ 3-4, 107.)  Hoover's allegations also specify that Cathay issued the Q&A Process "after

holding a Q&A session with USAOA" and that Cathay "'worked' with USAOA on the Q&A process" to clarify questions raised by US-based pilots. *Id.* ¶¶ 62-63. According to Hoover's allegations, it should have been abundantly clear to him at this point that USAOA, rather than objecting to the documents or the processes, was in fact working with Cathay to enact them.

Hoover also argues that that his claim did not accrue until July 1, 2017 because the new passenger pay scales went into effect on that date. (Dkt. 43 at 9.) None of the allegations Hoover cites in support of this argument make any mention of a July 1, 2017 accrual date, but he also cites the NTC and Q&A Process documents. The NTC provides that Cathay would "aim to advise" about the results of the bidding process by January 10, 2017, and states that, unless further training is required, pilots who successfully bid on new bases must take up the new base appointment "*within* six months i.e. for the roster period staring 1st July 2017" or at "an earlier date . . . mutually agreed upon." (Dkt. 29-3 at 3) (emphasis added). The NTC plainly provides that the new pay scales went into effect by July 1, 2017 at the latest, and potentially much earlier, depending on the individual pilot. Nothing in the complaint or attached documents supports Hoover's argument that his claim accrued on July 1, 2017. Because Hoover could or should have been able to discover that USAOA agreed to the NTC and Q&A Process by December 23, 2016, the statute of limitations on his fair-representation claim based on USAOA's conduct related to the NTC and Q&A Process began running on that date and expired six months later on June 23, 2017, long before he filed this suit.

Finally, the Court notes that Hoover correctly asserts that the statute of limitations for his fair-representation claims was tolled while he pursued internal union remedies. *See Frandsen v. Bhd. of Ry., Airline, and S.S. Clerks, Freight Handlers, Express & Stations Emps.*, 782 F.2d 674, 681-84 (7th Cir. 1986); *see also Rios-O'Donnell*, 837 F. Supp. 2d at 874. But as his complaint

reveals, he did not begin pursuing those remedies until February 26, 2018, when he requested that USAOA file a grievance on his behalf. (Dkt. 29 ¶ 81.) By that time, the limitations period on his non-grievance claim had long expired. *Cf. Rios-O'Donnell*, 837 F. Supp. 2d at 874 (finding that fair-representation claims based on grievance and non-grievance related conduct were both tolled during pursuit of internal union remedies where plaintiff pursued those remedies within one week of the complained-of conduct).

Hoover's fair-representation claim based on USAOA's conduct related to the NTC and Q&A Process is dismissed with prejudice under Rule 12(b)(6) because it is time-barred. *See, e.g.*, *Taha v. Int'l Bhd. of Teamsters*, No. 18 C 1201, 2018 WL 6528018, at *5-6 (N.D. Ill. Dec. 12, 2018) (dismissing time-barred RLA claims under Rule 12(b)(6)); *Steffens v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 797 F.2d 442, 445 (7th Cir. 1986) (affirming dismissal of time-barred RLA claim under Rule 12(b)(6)); *see also Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011) ("While a statute of limitations defense is not normally part of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), when the allegations of the complaint reveal that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim.").

### b. Failure to State a Claim

Though Hoover's grievance-related fair-representation claim is timely, it too must be dismissed under Rule 12(b)(6), because it fails to state a claim for relief.

"[W]hen a union serves as the exclusive bargaining agent for a group of employees, it assumes a duty of fair representation." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018). The duty is "an implied 'statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise [ ] discretion with complete good faith

and honesty, and to avoid arbitrary conduct.'" *Id.* (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, (1967)). "The union's duty of fair representation extends to its negotiations with an employer concerning an 'employee's terms and conditions of employment, and provisions for processing his grievances.'" *Rupcich v. United Food and Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (citation omitted).

"A union breaches the duty of fair representation if its actions are (1) arbitrary, (2) discriminatory, or (3) made in bad faith." *Bishop*, 900 F.3d at 397 (citing *Air Line Pilots Ass's, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)); *see also Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013) ("To prevail on a claim that his union violated its duty of representation by dropping a grievance, a [plaintiff] must show that the union's decision was arbitrary or based on discriminatory or bad faith motives.") "A plaintiff is successful in pleading a breach of the duty of fair representation if he plausibly pleads a breach under *any* of the three prongs." *Bishop*, 900 F.3d at 397 (emphasis in original) (citation omitted). "Therefore, each prong 'must be considered separately in determining whether or not a breach has been [pleaded].'" *Id.* (citation omitted). The inquiry for each prong is different. *Id.*

To determine whether a union's actions are arbitrary, courts use "an objective inquiry." *Rupcich*, 833 F.3d at 854. The Court's "review of whether a union acted arbitrarily in deciding not to pursue a grievance or arbitration is 'highly deferential.'" *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997). This is so because "Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative." *Yeftich*, 722 F.3d at 917. The Court cannot "substitut[e] [its] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1177 (7th Cir.1995). "A union's actions are arbitrary only if . . . the union's behavior is so

far outside a wide range of reasonableness as to be irrational." *Yeftich*, 722 F.3d at 917 (citation

omitted); *see also Bishop*, 900 F.3d at 397-98. "While a union may not arbitrarily ignore a meri-

torious grievance or process it in perfunctory fashion, it has discretion to act in consideration of

such factors as the wise allocation of its own resources, its relationship with other employees, and

its relationship with the employer." *Yeftich*, 722 F.3d at 917 (citations omitted). "The union must

provide some minimal investigation of employee grievances, but the thoroughness of this investi-

gation depends on the particular case, and only an egregious disregard for union members' rights

constitutes a breach of the union's duty." *Id.* (quoting *Garcia*, 58 F.3d at 1176).

The inquiry for discriminatory or bad faith conduct, on the other hand, "calls for a subjec-

tive inquiry" into the motives of the union. *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369

(7th Cir. 2003). It is not enough that a union's otherwise rational decision had a discriminatory

impact. *See Bishop*, 900 F.3d at 398. Instead, a claim of discriminatory or bad faith conduct

"requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d

at 369. If such an improper motive can be shown, it can taint a union's decision that otherwise

would not constitute actionable discrimination or be considered arbitrary. *Bishop*, 900 F.3d at 398.

On this factor, although a plaintiff must supply more detail than just "[b]are assertions of the state

of mind," *Yeftich*, 722 F.3d at 916, a complaint might pass muster if it "offer[s] facts that suggest

a motive for the union's alleged" bad-faith conduct. *Bishop*, 900 F.3d at 397 (quoting *Yeftich*, 722

F.3d at 916). Allegations of "fraud, deceitful action or dishonest conduct" are evidence of bad

faith. *See Humphrey v. Moore*, 375 U.S. 335, 348 (1964).

Beginning with arbitrariness, Hoover generally alleges that USAOA acted arbitrarily by

denying his request to file a grievance. *See* Dkt. 29 ¶ 106. ("In deciding not to file a formal

grievance, USAOA acted arbitrarily.") In his opposition brief, Hoover clarifies that USAOA acted

arbitrarily by "ignoring [his] meritorious grievance" and "rel[ying] on the Q&A as the basis of its decision." (Dkt. 43 at 10, 13.) But Hoover's allegations do not support his argument that the USAOA "ignored" his grievance. To the contrary, the complaint and attached documents reveal that the Committee requested relevant materials from Hoover, reviewed relevant agreements, discussed the grievance internally and with a member of the union with direct knowledge of the subject, referred their decision elsewhere within the union for review, and provided Hoover with a reasoned response declining his request. (Dkt. 29 ¶¶ 87-88, 91-93, 96; *see* also Dkt. 29-9.) Nothing in the complaint suggests that USAOA "ignored" Hoover's grievance or even processed it in a perfunctory fashion. "Declining to pursue a grievance as far as a union member might like isn't by itself a violation of the duty of fair representation." *Yeftich*, 722 F.3d at 916. It's only a violation if Hoover's complaint demonstrates that the USAOA's decision was "so far outside a wide range of reasonableness as to be irrational." *Id.* at 917. To the contrary, the complaint shows that the USAOA arrived at its decision after a deliberate process and based the decision on a number of reasoned bases, all of which led USAOA to conclude that it could not find any evidence that Cathay's actions breached the CBA. (*See* Dkt. 29-9.)

Hoover also argues that the USAOA's reliance on the Q&A Process as a basis for its decision not to file a grievance was irrational and arbitrary because the Q&A Process amounts to a "side document" that contradicts fundamental terms of the CBA. (Dkt. 43 at 11, 13.) Again, Hoover alleges that USAOA acted arbitrarily only if he plausibly alleges that USAOA's reliance on the Q&A Process in its decision not to pursue his grievance "is so far outside a wide range of reasonableness as to be irrational." *Yeftich*, 722 F.3d at 917. As discussed further below, Hoover has not plausibly alleged that Cathay's actions related to the Q&A Process violated the CBA, so USAOA's reliance on the Q&A Process could not have been irrational or arbitrary for that reason.

For these reasons, Hoover has not plausibly alleged that USAOA acted arbitrarily when it denied his request to file a grievance.

As for discrimination and bad faith, Hoover's complaint falls short here as well. Hoover generally alleges that USAOA acted "discriminatorily," "deceitfully," and "in bad faith" by failing to pursue his grievance, *see* Dkt. 35 ¶¶ 111, 115, but the facts alleged his complaint do not support these conclusory allegations. There are no allegations in the complaint that USAOA acted on the basis of an "invidious' trait such as race, gender, national origin, union membership, or internal union politics." *Cunningham v. United Airlines, Inc.*, No. 13 C 5522, 2014 WL 441610, at *10 (N.D. Ill. Feb. 4, 2014), *aff'd sub nom. Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539 (7th Cir. 2014). In his opposition brief, Hoover points to his allegations that the Committee consulted Captain Goldman, who made statements a year and a half earlier that, according to Hoover, "imply that [Captain Goldman] put his personal interest ahead" of Hoover's. (Dkt. 43 at 14-15; *see also* Dkt. 35 ¶¶ 92-94.) First, the Court cannot discern or infer the significance of Goldman's alleged statements, because the complaint does not provide any context whatsoever for the statements and, as worded, they are difficult to parse. Second, even if the Court could understand the significance of Goldman's alleged statements, the complaint does not plausibly allege that out-of-context statements made in October 2016 somehow suggest an improper motive on USAOA's part in March 2018. Hoover also cites his allegations that the two Committee representatives who handled his grievance request were Freighter Captains whose rate of pay was changed from the Freighter Captain pay scale to the Passenger Captain pay scale after they successfully bid on new bases. Hoover argues this gave them a "possible personal motive." (Dkt. 43 at 14.) But the complaint belies this possibility. As Hoover alleges, those two did not act alone—the Committee referred its decision elsewhere within the union for approval and consulted Goldman. Even if that

were not the case, allegations that give rise to a "possible personal motive" are too speculative, without more, to show that USAOA acted with an improper motive. There are no other allegations in the complaint to support Hoover's contention that USAOA acted with an improper motive when it denied his request to file a grievance. Hoover has not plausibly alleged that USAOA acted discriminatorily or in bad faith.

For all these reasons, Hoover's complaint fails to state a claim against USAOA for breach of the duty of fair representation. USAOA's motion to dismiss is granted and Hoover's fair-representation claim based on USAOA's conduct related to the grievance process is dismissed without prejudice under Rule 12(b)(6).

## III. Count II Against Cathay – Breach of the CBA

Hoover alleges that Cathay breached the CBA by changing material terms related to his seniority and rate of pay. (Dkt. 29 ¶¶ 124-33.) Cathay moves to dismiss Hoover's breach-of-contract claim under Rules 12(b)(1) and 12(b)(6), arguing that (1) the Court lacks subject-matter jurisdiction over Hoover's claim because it is preempted by the RLA; (2) the claim is barred by the application statute of limitations; and (3) Hoover fails to state a claim for breach of contract.

### a. The Railway Labor Act

The RLA promotes stability in labor-management relations by "providing a comprehensive framework for resolving labor disputes" in the railroad industry. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). "Specifically, the RLA establishes a mandatory arbitral mechanism for the prompt and orderly settlement of two classes of disputes—major disputes and minor disputes." *Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001). "Major disputes" involve "rates of pay, rules or working conditions" or "the formation of collective [bargaining] agreements or efforts to secure them." *Hawaiian*, 512 U.S. at 252. "Minor disputes," on the other hand, involve

"controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Id.* at 253.

Minor disputes "must be adjudicated under RLA mechanisms, which include an employer's internal dispute-resolution procedures and an adjustment board established by the unions and the employer." *Brown*, 254 F.3d at 658. Minor disputes are subject to "mandatory and exclusive arbitration under the RLA." *Id.*; *see also Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 314 (7th Cir. 2002) ("Arbitral boards established pursuant to the Railway Labor Act have exclusive jurisdiction to resolve disputes over the application of collective bargaining agreements in the railroad and airline industries."). Claims are preempted by the RLA if they "cannot be adjudicated without interpreting the CBA, or if [they] can be conclusively resolved by interpreting the CBA." *Brown*, 254 F.3d at 658.

### b. The Court's Jurisdiction and RLA Preemption

The Court begins, as it must, with Cathay's motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. "Ensuring the existence of subject-matter jurisdiction is the court's first duty in every lawsuit." *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005). Cathay argues that Hoover's breach-of-contract claim is a "minor dispute" under the RLA because it arises out of conflicting interpretations of the CBA and is thus subject to mandatory arbitration by the System Board of Adjustment. Hoover does not dispute that his claim is a minor dispute under the RLA or that such a claim, standing alone, would be subject to mandatory arbitration by the System Board of Adjustment. *See* Dkt. 42 at 6. He argues that the Court maintains jurisdiction over his claims anyway because this is a "hybrid action" and is thus exempted from the RLA's usual preemption.

Some courts have recognized that "hybrid actions" can be exempt from RLA preemption, allowing an employee suing his union for breach of the duty of fair representation to sue his

employer for breach of the collective bargaining agreement in the same action, as long as the employee alleges that the employer and union colluded or "that the employer's conduct somehow contributed to the union's breach." *Steffens v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 797 F.2d 442, 445 (7th Cir. 1986); *see also, e.g.*, *Rios-O'Donnell v. American Airlines, Inc.*, No. 10 C 6219, 2013 WL 157610, at *7 (N.D. Ill. Jan. 10, 2013); *Martin v Am. Airlines*, 390 F.3d 601, 608 (8th Cir. 2004) ("[A] court has jurisdiction to consider a contract violation claim against an employer . . . where there are good faith allegations and facts supporting those allegations indicating collusion or otherwise tying the [employer] and the union together in allegedly arbitrary, discriminatory or bad faith conduct amounting to a breach of the duty of fair representation.").

As an initial matter, Hoover cannot avail himself of the hybrid-action exception without bringing a fair-representation claim against USAOA and, as explained above, Hoover's claim is time-barred in part and otherwise fails to state a claim. But even if that were not the case, and Hoover had stated a cognizable claim against USAOA for breach of the duty of fair representation, his hybrid-action argument would still fail, because Hoover failed to allege collusion between USAOA and Cathay, or that Cathay's conduct contributed to USAOA's breach. The only facts that come close are those alleging that Cathay "worked with USAOA" to publish the Q&A Process and that Q&A Process was "agreed" between Cathay and USAOA. (Dkt. 29 ¶¶ 63, 80.) Allegations of agreement between the airline and the union are not enough to establish collusion. *See Air Wisc. Pilots Prot. Comm. v. Sanderson*, 124 F.R.D. 615, 617 (N.D. Ill. 1988) ("negotiation between the employer and union is not evidence of collusion") (citing *United Indep.*, 756 F.2d at 1283); *see also Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 791 (6th Cir. 2012) (agreement

between employer and union about how CBA should be interpreted does not demonstrate collusion).

Hoover argues that his hybrid action should survive Cathay's jurisdictional challenge because his breach-of-contract claim against Cathay is "not . . . easily separable" from his fair-representation claim against USAOA, so he should not be required to bring his claim against Cathay to the Board while separately litigating against USAOA in federal court. (Dkt. 42 at 6.) Hoover does not cite any case law to support this argument, and the Court is not aware of any case that holds that a court can exercise jurisdiction over an otherwise-preempted RLA claim against an employer solely because it is not "easily separable" from a fair-representation claim against a union. Hoover next argues that, because the Board does not have jurisdiction over his fair-representation claim against USAOA, the Court must have jurisdiction over the entire action. To pull this off, Hoover tries to argue that his suit "involves no dispute between employee and employer" and is instead solely a dispute between him and USAOA. (Dkt. 42 at 7.) That is simply not the case—Hoover sued Cathay for breach of contract, and he spends the rest of his brief arguing against dismissal of that claim. He cannot avoid RLA preemption by momentarily pretending his claim against Cathay does not exist. Hoover has not pleaded a "hybrid claim" and he cannot avoid RLA preemption on that ground.

c.       **Failure to Exhaust Remedies**

Hoover also argues that the Court should exercise jurisdiction over his claim because he fully exhausted his remedies under the CBA, which did not require him to arbitrate before the Board, and that even if he did not exhaust his remedies, pursuing his claim before the Board would have been futile.

Hoover first argues that the CBA does not require him to arbitrate his claim before the Board. Section 23.5 of the CBA sets forth a two-step grievance hearing process. (*See* Dkt. 29-1 at 63.) Section 23.7 states that "where the procedures outlined in Section 23.5 have been exhausted, and where either party wishes to advance this matter to external adjudication, [Cathay and USAOA] shall convene a System Board of Adjustment for final disposition, as required by" the RLA. (*Id.* at 64.) Hoover alleges that his grievance never reached the two-step process set forth in Section 23.5, and argues that Section 23.7, which requires arbitration before the Board, does not apply to him because it is limited to situations "where the procedures outlined in Section 23.5 have been exhausted." (Dkt. 29 ¶¶ 82, 89; Dkt. 42 at 9.) But even if Hoover had exhausted his internal USAOA remedies, he still must bring his claim before the Board, and he does not allege that he did. A "union's refusal to process [plaintiff's] grievance does not excuse him from exhausting his administrative remedies." *Woolridge v. Nat'l R.R. Passenger Corp.*, 800 F.2d 647, 649 (7th Cir. 1986); *see also Santiago v. United Air Lines*, 969 F. Supp. 2d 955, 966-69 (N.D. Ill. 2013) (individual employees may arbitrate their claims before the Board without the union's support or approval); *Cunningham*, 2014 WL 441610, at *4.

Hoover also briefly argues that arbitrating before the Board would be futile. (Dkt. 42 at 9.) Section 25 of the CBA provides that arbitration claims may be heard by a one-member or three-member Board. (Dkt. 29-1 at 68.) If a claim is heard by a three-member Board, one member is chosen by Cathay, one is chosen by USAOA, and one is a neutral party. (*Id.*) Hoover argues that a three-member Board could not fairly hear his claims because the members chosen by Cathay and USAOA (who clearly disagree with him) would outvote the neutral member. First, Hoover's argument ignores the possibility of a one-member Board, which is neutral arbitrator "selected by mutual agreement." (*Id.*) Second, the Court "will not assume that panel members 'obligated to

determine disputes . . . in an independent, impartial manner,' are partial or biased simply because a certain party selected them." *Cunningham*, 2014 WL 441610, at \*4 (quoting *Del Casal v. E. Airlines, Inc.*, 634 F.2d 295, 299 (5th Cir. 1981)).  Hoover has not shown that he exhausted his administrative remedies nor that doing so would have been futile.

Hoover concedes that his breach of contract claim against Cathay is a minor dispute subject to mandatory arbitration.  He also concedes that he did not attempt to arbitrate before the Board.  He has not pleaded a hybrid claim and he has not shown that he exhausted his remedies or that doing so would be futile.  Accordingly, Hoover's claim against Cathay is dismissed with prejudice for lack of subject matter jurisdiction because it is preempted by the RLA.

### d.  Failure to State a Claim for Breach of Contract

Cathay also moves to dismiss Hoover's breach of contract claim under Rule 12(b)(6) for failure to state a claim.  The thrust of Hoover's claim is that the new permanent base vacancies announced in the NTC created 747 Freighter Captain positions compensated on the Passenger Captain pay scale, which pays more than the Freighter scale.  Meanwhile, Freighter Captains like Hoover, who did not bid on the new positions or bid unsuccessfully, were stuck doing the same work as the successful bidders—flying 747 Freighter aircraft—but were still getting paid on the lower Freighter Captain scale.  According to Hoover, the NTC and Q&A Process created "two classes" of 747 Freighter Captains—those who were awarded one of the new vacancies and thus moved up to the Passenger Captain pay scale, and those who were not awarded a new vacancy and thus stayed on the Freighter Captain pay scale.  (*See* Dkt. 29 ¶¶ 65-68, 120-21.)  Hoover argues that this resulted in two Freighter Pilots junior to him being moved to the higher pay scale.  (Dkt. 42 at 11.)  In Hoover's telling, the Q&A Process thus modified the CBA only as to certain pilots, and to Hoover's detriment, because it "depriv[ed] [him] (and a few other Freighter Captains) from

their seniority as of the time of joining [Cathay] for pay purposes." (Dkt. 43 at 11-12; *see also* Dkt. 42 at 10-11.)

Hoover claims that the NTC and Q&A Process breached Sections 5 and 6 and Schedule 1 of the CBA and Section 6.7 of the PBPA 06. (Dkt. 29 ¶¶ 126-27; Dkt. 42 at 10-11). Section 5 of the CBA is titled "Seniority and Promotion." (Dkt. 29-1 at 18.) Hoover identifies only one provision in Section 5 that he claims the NTC and Q&A violated—the one providing that a pilot's seniority is determined "according to his date of joining as an Officer." (*See* Dkt. 42 at 10; Dkt. 43 at 4; *see also* Dkt. 29-1 at 18 § 5.1.2.) As for Section 6, titled "Compensation," the only relevant provision he identifies states that "First Officer and Captain Salary scales are as specified in Schedule 1 of the Agreement." (*See* Dkt. 42 at 11; Dkt. 43 at 4; *see also* Dkt. 29-1 at 20 § 6.1.2.) Schedule 1 consists of one set of yearly pay scales titled "Unified FO and Passenger Captain Scale" and another set of yearly pay scales titled "Freighter Salary Scale." (Dkt. 29-1 at 78-83.) And Section 6.7 of the PBPA 06 states that "Seniority of Officers shall be in accordance with the Officer's Conditions of Service." (Dkt. 29-4 at 4.) According to Hoover, Section 6.7 provides that, for bid purposes, new bases are allocated by seniority. (Dkt. 43 at 5; Dkt. 29 ¶ 60.)

Hoover claims that the NTC and Q&A Process breached the CBA because they changed the CBA's definition of seniority "for pay purposes." Hoover seems to be arguing, citing the Sections listed above, that it breaches the CBA when a Freighter Captain with less seniority than Hoover gets paid more than him after successfully bidding on a new base vacancy. This is where his claim falters. Hoover's argument repeatedly conflates two concepts: (1) another Freighter Captain's successful bid for a new base vacancy compensated on the Passenger Captain scale, and (2) his own loss of seniority for pay purposes in violation of the CBA. But there are no allegations that plausibly connect the dots between the effects of the NTC and Q&A Process on the one hand

and Hoover's "loss of seniority," and how that violates the CBA, on the other. To be clear, Hoover plausibly alleges that there are Freighter Captains with less seniority than him who are now paid more than he is because they successfully bid on one of the new base vacancies announced in the NTC. But he fails to plausibly allege how that "deprives him" of his seniority "for pay purposes" and, more importantly, to identify any language or provision in the CBA that requires all Freighter Captains junior to him to be paid less than him, particularly when they have bid on a new base vacancy. Nor does he identify any provision that entitles him to the higher pay granted to Freighter Captains who successfully bid on a new base vacancy. For these reasons, Hoover fails to state a breach of contract claim against Cathay.

## CONCLUSION

For the reasons stated here, Cathay's motion to dismiss (Dkt. 36) is granted. Hoover's claim against Cathay is dismissed with prejudice for lack of subject matter jurisdiction because it is preempted by the RLA. USAOA's motion to dismiss (Dkt. 33) is also granted. Hoover's fair-representation claim based on USAOA's conduct related to the NTC and Q&A Process is dismissed with prejudice under Rule 12(b)(6) because it is time-barred. Hoover's fair-representation claim based on USAOA's conduct related to the grievance process is dismissed without prejudice because it fails to state a claim for relief. If Hoover wishes to file a second amended complaint for the claims dismissed without prejudice, he must do so by August 26, 2019.

_____
Virginia M. Kendall
United States District Judge

Date: August 5, 2019

24